OPINION OF THE COURT
Lawrence H. Ecker, J.
The court determines as follows:
Plaintiff was the general contractor and ACT Abatement, LLC, an asbestos removal firm, was its subcontractor at a work site in New York. Allen Freeman is a sole proprietorship insurance broker, and Scott Handwerger is alleged to be the principal of A. Logan Insurance Brokerage, the other named insurance broker. Plaintiff commenced this action as a result of ACT’s failure to maintain workers’ compensation insurance pursuant to its contract with plaintiff at the work site.[1]
On two occasions during the relevant period, on April 11, 2011 and July 5, 2011, two employees of ACT were separately injured at the work site, Marco Escalante on April 11, 2011 and Johnny Garcia on July 5, 2011. However, at the time of each accident, ACT was not covered by workers’ compensation insurance. The two injured ACT employees filed workers’ compensation claims, as well as a tort claim against plaintiff. As a result of ACT’s lack of coverage, plaintiff was required to use its own workers’ compensation insurance to cover the two injured employees, in accordance with Workers’ Compensation Law § 56. This resulted in an increase in its rates for the maintenance of its workers’ compensation coverage for which plaintiff now seeks compensatory and punitive damages.
This case centers around the certificates of insurance (accord form 25) provided to plaintiff which, plaintiff alleges, caused it to believe the necessary workers’ compensation coverage that was to include ACT as the insured, and plaintiff as an additional insured, was in place during the relevant time periods. Predicated upon the submissions of the parties, which include the depositions of the parties and nonparties, and the affidavits *507 of the parties and nonparty Robert C. Kirkwood (exhibit 4),[2] the court makes the following findings of fact, and does so, in the light most favorable to the party opposing the motion, and giving that party the benefit of every inference which can be drawn from the evidence. (Negri v Stop & Shop, 65 NY2d 625 [1985].)
Plaintiff, the general contractor, contracted with ACT to perform asbestos removal work at the Riverside Health Center construction site in Manhattan, owned by New York City, with TDX as the construction manager. As part of the subcontract agreement, ACT was to maintain workers’ compensation insurance coverage and general liability insurance coverage, designating plaintiff as an additional insured. On or about January 13, 2011, Freeman, an insurance broker, provided to plaintiff a certificate of insurance which showed workers’ compensation coverage (New York compensation policy No. 662826) for the period October 12, 2010 through October 12, 2011, and general liability insurance coverage for the period September 8, 2010 through September 8, 2011 (Certain Underwriters at Lloyd’s, London, policy No. PGIARK00572). Plaintiff was named as certificate holder, ACT was named as insured, and Freeman was named as producer (H/L exhibit H).[3]
According to the deposition of Darren Caputo, ACT’s project manager at the site, ACT began its work on the basis of the issuance of the certificate of insurance. On or about April 11, 2011, Marco Escalante, an employee of ACT, was injured at the site. When it was discovered that there was no workers’ compensation policy in place, plaintiff was required to use its own workers’ compensation policy to cover Escalante’s injuries, thereby affecting plaintiff’s experience rating and increasing its premium expense.
Thereafter, on or about June 13, 2011, a second certificate of insurance, for workers’ compensation insurance coverage, was procured through Logan, incorrectly dated October 13, 2010, once again showing ACT as the insured and plaintiff as the certificate holder. The insurance policy was listed as having been issued by Chartis Insurance, policy number WC3B94723, for the period June 10, 2011 through June 10, 2012, and signed by Handwerger (plaintiffs exhibit 5). This certificate of insur- *508 anee was replaced by another certificate of insurance to accurately reflect the date of issuance as June 17, 2011, and otherwise with the same information as the former (plaintiff’s exhibit 6).
On June 9, 2011, following the Escalante incident on April 11, 2011, the Enforcement Unit of the New York State Workers’ Compensation Board (WCB) issued a stop-work order to ACT at the work site upon its failure to secure workers’ compensation coverage (H/L exhibit J). According to Caputo, he confirmed with Logan that the workers’ compensation coverage was in place after receiving the June 17, 2011 certificate of insurance (plaintiff’s exhibits 5, 6). Caputo testified that once the coverage from Logan was confirmed, ACT resumed its work at the site, without having received clearance from the State to do so.
On or about July 5, 2011, a second ACT employee, Johnny Garcia, was injured at the site. Once again, it was discovered that there was no workers’ compensation coverage in place, thus requiring plaintiff to use its coverage, which again, increased its rating and premium expense.[4] It is due to the failure to actually procure the workers’ compensation policies in January 2011 and June 2011 that plaintiff now brings this action for fraudulent misrepresentation against ACT and the insurance brokers.
The certificate of liability insurance (accord form 25), used on each relevant occasion (plaintiff’s exhibits 1, 6), states at the top of the document, in capital letters:
“THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.”
Further down on the same page, the certificate states, in capital letters:
*509 “THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.”
This language, plaintiff now argues, led it to believe that there was coverage for each of the accidents, that the conduct and representations on Freeman’s part and Handwerger’s/ Logan’s parts were contrary to what was stated in the certificates of insurance, and that it relied upon these knowingly false statements to its detriment, thereby leading to its claim for damages. Plaintiff submitted, as part of its opposition to the motions, the affidavit of Robert C. Kirkwood, an insurance broker who services it, who opined that it is not an industry standard to deliver a certificate of insurance to a client unless the insurance policy has actually been issued and in good stead (plaintiff’s exhibit 4 ¶ 11). Further, he states there is nothing known as a “sample” policy, as testified to by Hand-werger, when asked in his deposition about the purpose of the certificate of insurance that Logan provided to plaintiff (plaintiff’s exhibit 4 ¶ 8).
In support of their motion for summary judgment, Handwerger/Logan argue they cannot be responsible for the lack of coverage for the Escalante accident in April 2011, because they were not the listed producer in the certificate of insurance dated January 13, 2011. As to the Garcia accident in July 2011, they rely upon the earlier quoted “disclaimer” language, supra, which they argue placed plaintiff on notice that the certificate of insurance did not constitute actual proof of coverage. They further argue that when the ACT employees returned to work following the issuance of the stop-work order issued by the WCB, they did so without having obtained official permission to do so by the Commissioner of the Department, as required by law, and known by Caputo, ACT’s manager, and thus proceeded at their own risk, and not due to any action on Handwerger’s/Logan’s parts.
*510 Handwerger/Logan argue that plaintiff knew in February 2011 that there was a problem with the ACT general liability policy because plaintiff actually paid part of the premium, for which it was to take a credit against payments due ACT. As to the issue of the “sample” certificate of insurance, Handwerger stated he could not place workers’ compensation coverage for plaintiff when asked to do so because no carrier would accept the contract, the certificate furnished to Summit was given by a former employee, and that he, Handwerger, advised ACT’s representative, Ronald Dunbar, that there was no actual coverage. Handwerger denied knowing that the certificate had been issued by his employee to ACT until after he learned of this lawsuit. Handwerger denies plaintiff was ever Logan’s client, or that Logan was asked by plaintiff to procure insurance coverage for it.
In support of its motion for summary judgment, Freeman relies upon the “disclaimer” language of the January 13, 2011 certificate of insurance (exhibit 1), which despite his denial, shows that he was the producer of the policy. (Liederman mem at 3.) Freeman describes the agreement between plaintiff and ACT in February 2011, whereby plaintiff made the payments to reinstate the general liability policy on ACT’s behalf, in return for the credit against ACT’s invoices to plaintiff, as a result of which Freeman sent plaintiff a copy of the rescission of cancellation notice dated February 3, 2011. (Freeman exhibit H.) Freeman avers that he advised plaintiff in the communication under which he sent the notice of rescission that he assumed the workers’ compensation policy had been cancelled but could not confirm the status as he was not the “writing agent.” (Id.) Freeman argues that he never made a representation that the workers’ compensation coverage indicated in the January 2011 certificate of insurance was, or was not, in effect; hence, there was no misrepresentation on his part, in that he did not learn until the issuance of the stop-work order in June 2011, that there had been a lapse in coverage, which together with the two ACT employees’ accidents, postdate the January 2011 certificate.
Freeman also argues that Summit, which received the stop-work order, permitted ACT to proceed with its work in the absence of Department of Labor approval. However, in any event, according to Freeman, there was actually workers’ compensation coverage in effect at the time of the issuance of the certificate of insurance, with New York compensation *511 managers, which did not lapse until January 17, 2011, four days after the date of issuance on January 13, 2011, such that the coverage stated in the certificate of insurance was accurate.
In opposition, plaintiff argues that there are credibility issues that must be resolved by the trier of fact, and that it should not be denied the opportunity to prove its case by demonstrating the elements of fraudulent misrepresentation to the jury, namely (1) a misrepresentation or omission of material fact which was false and known to be false by defendant; (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely on it; (3) justifiable reliance by plaintiff on the misrepresentation or material omission; and (4) injury. (Hecker v Paschke, 133 AD3d 713 [2d Dept 2015]; Cervera v Bressler, 126 AD3d 924 [2d Dept 2015]; Blanco v Polanco, 116 AD3d 892 [2d Dept 2014].)
The initial issue to be determined, as to Freeman and Handwerger/Logan, is whether the “disclaimer” language of the certificate of insurance (exhibit 1) suffices, as a matter of law, to justify the granting of summary judgment to them. In Greater N.Y. Mut. Ins. Co. v White Knight Restoration (7 AD3d 292, 293 [1st Dept 2004]), the Court affirmed the dismissal of the action brought by the owner and general contractor against the subcontractor’s insurance broker for breach of contract and negligence. In its decision, the Court stated,
“Regardless of whether the broker acted recklessly, the causes of action for fraud and negligent misrepresentation, based on the inaccurate certificates, were properly dismissed because it was unreasonable to rely on them for coverage in the face of their disclaimer language and, with respect to the negligent misrepresentation claim, because of the absence of a relationship approximating privity (see Benjamin Shapiro Realty Co. v Kemper Natl. Ins. Cos., 303 AD2d 245 [(1st Dept) 2003], lv denied 100 NY2d 573 [2003]).” (7 AD3d at 293.)
In Federal Ins. Co. v Spectrum Ins. Brokerage Servs. (304 AD2d 316 [1st Dept 2003]), the plaintiff was an insurance company subrogee that brought the action against the broker who allegedly failed to procure sufficient coverage for plaintiff’s subrogors as additional insureds, and the insurer with which the broker placed the coverage that it did obtain. The Court affirmed the dismissal of the complaint upon the grounds that plaintiff was not suing the party who caused the injury to its *512 subrogor, and that the broker owed no duty to the plaintiff, but only to the broker’s customer, the contractor. Since plaintiff’s insured did not have a viable claim against the broker, plaintiff therefore had no claim against its insured’s subrogee.
In Benjamin Shapiro Realty Co. v Kemper Natl. Ins. Cos. (303 AD2d 245 [1st Dept 2003]), the Court affirmed the dismissal of the action brought by the plaintiff/landlord against its tenant’s insurance broker for negligent misrepresentation, by reason of its issuance of certificates of insurance representing that the tenant’s insurance policy, naming the landlord as additional insured, contained rental coverage insurance for landlord’s benefit, even though such coverage was not included in the policy. The Court held that there was no contractual relationship between the landlord and the tenant’s broker, and
“the fact that plaintiff had contact with Tanenbaum [the broker] in the course of obtaining the certificates of insurance did not give rise to the sort of relationship, i.e., one approaching that of privity, requisite to the imposition of liability for negligent misrepresentation (see Credit Alliance Corp. v Arthur Andersen & Co., 65 NY2d 536 [1985]).” (303 AD2d at 245-246.)
“Moreover, where, as here, certificates of insurance contain disclaimers that they are for information only, they may not be used as predicates for a claim of negligent misrepresentation.” (Id. at 246 [citations omitted]; see also Binyan Shel Chessed, Inc. v Goldberger Ins. Brokerage, Inc., 18 AD3d 590, 593 [2d Dept 2005, Santucci, J., concurring in part and dissenting in part] [“Indeed, this Court has consistently held that such a certificate is insufficient to establish an issue of fact as to the existence of the alleged insurance coverage” (citations omitted)].) In addition, the issuance of the certificate cannot serve as a basis for a cause of action alleging either fraud or negligent misrepresentation. (See Greater N.Y. Mut. Ins. Co. v White Knight Restoration; Benjamin Shapiro Realty Co. v Kemper Natl. Ins. Cos.)
Finally, in Penske Truck Leasing Co. v Home Ins. Co. (251 AD2d 478 [2d Dept 1998]), the Court stated,
“It is well settled that a certificate of insurance with the aforementioned disclaimer language is insufficient, by itself, to establish that the certificate holder is insured. A certificate of insurance is evidence of a contract for insurance, but is not conclusive proof that the contract exists and not, in *513 and of itself, a contract to insure.” (Id. at 479 [citations omitted]; see also American Ref-Fuel Co. of Hempstead v Resource Recycling, 248 AD2d 420 [2d Dept 1998] [certificate of insurance was a matter of information only and was insufficient by itself to establish that plaintiff was insured].)
Applying the above legal principles, the question on these motions for summary judgment and dismissal, where the depositions of the parties and nonparties have been taken, and affidavits have been submitted, is whether it was reasonable for plaintiff to assume it could rely upon the certificate of insurance as presented to it in each instance, sufficient to raise a triable issue of fact as to fraudulent misrepresentation by either Freeman or Handwerger/Logan.
The court is mindful that it is not the court’s function on a motion for summary judgment to assess credibility (Chimbo v Bolivar, 142 AD3d 944 [2d Dept 2016]; Garcia v Stewart, 120 AD3d 1298, 1299 [2d Dept 2014]), or to engage in the weighing of evidence. (Scott v Long Is. Power Auth., 294 AD2d 348 [2d Dept 2002].) A motion for summary judgment “should not be granted where the facts are in dispute, where conflicting inferences may be drawn from the evidence, or where there are issues of credibility” (Ruiz v Griffin, 71 AD3d 1112, 1115 [2d Dept 2010]).
Upon review of the parties’ submissions, upon consideration of the above-cited applicable law, and affording plaintiff, as the non-movant, the greatest benefit, the court finds that plaintiff has failed to demonstrate that it has a viable cause of action against Freeman or Handwerger/Logan for fraudulent misrepresentation. As in Benjamin Shapiro Realty Co., there is evidence in this record that contact was made at times between plaintiff and movants. However, there is nothing in this record, following conclusion of pretrial disclosure and the filing of the note of issue, to suggest collusion between Freeman or Handwerger/Logan and the carriers who were listed in the certificate of insurances at issue, nor a long delay from date of issuance to payment,[5] nor use of a policy identification number that did not exist. Plaintiff may well have a viable claim against ACT, or its principal, Jeter, both of whom have defaulted. However, the fact that plaintiff may not be able to *514 recover against those defendants cannot serve as the vehicle upon which to impose liability against Freeman or Handwerger/ Logan, where, as a matter of law, none exists. In sum, the court finds that movants have successfully demonstrated that they are entitled to summary judgment.
The court has considered the additional contentions of the parties not specifically addressed herein. To the extent any relief requested by either party was not addressed by the court, it is hereby denied. Accordingly, it is hereby ordered that the motions for summary judgment and dismissal of the complaint, and cross claims, made by defendants Scott Handwerger, A. Logan Insurance Brokerage, and Allen Freeman are granted in their entirety, and the complaint is dismissed against them.

. ACT Abatement, LLC and Eric Jeter, another named defendant, have defaulted in appearing or answering.

. Court rules require that the same exhibit letter not be repeated within the same motion sequence.

. Handwerger/Logan exhibits are referred to as H/L exhibits.

. The WCB issued separate rulings in the Escalante and Garcia cases. It found in each case that ACT was uninsured on the date of the accident and in violation of Workers’ Compensation Law § 50, and that plaintiff was 100% liable for the workers’ compensation award under Workers’ Compensation Law § 56 (H/L exhibits I, K).

. In fact, in none of the parties’ submissions, other than the payment by plaintiff of the general liability policy, is there mention of payment of the premiums for the workers’ compensation coverage.